UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
UNITED STATES OF AMERICA,          )  Criminal Action No.
                                   )  16-CR-00096
vs.                                )
                                   )  July 26, 2017
SHARAFAT ALI KHAN,                 )  3:33 p.m.
              Defendant.           )  Washington, D.C.
 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

**TRANSCRIPT OF HEARING**
**(Continued-Day 2, with Redaction)**
**BEFORE THE HONORABLE REGGIE B. WALTON,**
**UNITED STATES DISTRICT COURT JUDGE**

**APPEARANCES:**
FOR THE GOVERNMENT:        RICHARD E. DiZINNO
                           United States Department of Justice
                           555 Fourth Street, NW
                           Washington, DC 20530
                           (202) 252-6884
                           Email: Richard.dizinno@usdoj.gov

                           JAMES MICHAEL SHECKELS
                           United States Department of Justice
                           Criminal Division
                           1301 New York Avenue, NW, Suite 200
                           Washington, DC 20005
                           (202) 305-9055
                           Email: Mike.sheckels@usdoj.gov


FOR THE DEFENDANT:         LOUI ITOH
                           Federal Public Defender
                           For the District of Columbia
                           625 Indiana Avenue, NW, Suite 550
                           Washington, DC 20004
                           (202) 208-7500
                           Email: Loui_itoh@fd.org


INTERPRETER:               Nabel Sarwar Sheikh

COURT REPORTER:            Elizabeth Saint-Loth, RPR, FCRR
                           Official Court Reporter
                           Washington, D.C.  20001
                           202-354-3242

     Proceedings reported by machine shorthand, transcript
     produced by computer-aided transcription.

1                       **P R O C E E D I N G S**

2              THE COURT:  Good afternoon.

3              THE DEPUTY:  Your Honor, this afternoon, this is

4      the matter of the United States versus Sharafat Ali Khan.

5      This is criminal record 16-96.

6                   All parties are present, Your Honor.

7              MR. DIZINNO:  Good afternoon, Your Honor.  Richard

8      Dizinno, for the United States, along with my co-counsel,

9      Michael Sheckels.

10             THE COURT:  Good afternoon.

11             MS. ITOH:  Good afternoon, Your Honor.  Loui Itoh

12     on behalf of Mr. Khan.

13             THE COURT:  Counsel, you may proceed as if you

14     were just at the point where you are going to make your

15     argument.

16             MR. DIZINNO:  Your Honor, before Ms. Itoh

17     proceeds, there is one point that the Government wanted to

18     raise.  We can do it after Ms. Itoh gives her allocution or

19     before.  It was the issue that Your Honor had asked

20     Mr. Brustman a particular question that the Government

21     indicated that we had representations about so --

22             THE COURT:  Why don't we do that before she makes

23     her --

24             MR. DIZINNO:  And the point was -- Your Honor

25     asked about the detention period between the release date

1    and the potential actual removal from the United States.

2              The Government was able to talk to an ICE agent

3    through the lead agent in this case, Dan Schoonhen, who is

4    seated at counsel table.

5              That agent indicated to me, based on the facts of

6    this case that, in this person's estimation, this agent is

7    responsible for actual removal.  In his personal estimation,

8    it would take approximately a week for Mr. Khan to actually

9    get on a plane and leave the United States.

10             Obviously, that is subject to variables.  And

11   there is a possibility that that could take longer but, in

12   this agent's estimation, it would take a week.

13             Now, the defense has filed the letter that was

14   submitted to the Court on Monday that indicates, you know, a

15   number of issues that may arise with deportable aliens that

16   may delay that travel.

17             The number one issue that was highlighted by that

18   individual was the lack of travel documents.  In this case,

19   the Government is in possession of Mr. Khan's actual

20   passport.  And so the ability to have that passport, as well

21   as a signed determination by the Court that Mr. Khan has

22   consented and the Judge has ordered removal will avoid

23   delays in the administrative process, as well as having the

24   passport, would avoid any delay in the actual logistical

25   process of getting Mr. Kahn back to Pakistan.

1          THE COURT:  I don't know what the answer to this

2     question is, I have never had this situation.  I have never

3     had a hotly contested issue regarding the question of how

4     long somebody would remain in ICE custody before they were

5     deported.  But assuming, theoretically, it took longer than

6     he anticipates, and it was several months; I guess it would

7     be no problem with the defense counsel coming back and

8     requesting that the sentence be reduced by whatever period

9     of time that was, right?

10         MR. DIZINNO:  Well, respectfully, Your Honor, the

11    Government's position is that the Court's sentence is the

12    Court's sentence.  And whatever period of detention that

13    Mr. Kahn has to incur as a result of immigration issues is

14    totally separate and apart from the criminal penalty that he

15    faces.

16         THE COURT:  Yes.  But didn't the Smith case say

17    that that was an appropriate thing to take into account?

18         MR. DIZINNO:  Well, that is one of the things to

19    take into account.  But I think Smith was more focused on

20    the residential reentry program, and that portion of --

21    again, we think incorrectly focusing on that, and trying to

22    similarly situate deportable alien defendants with otherwise

23    similarly situated defendants.

24         THE COURT:  Okay.  Thank you.

25         MR. DIZINNO:  Thank you, Your Honor.

1          MS. ITOH:  Good afternoon, Your Honor.

2          I will first address the four-point enhancement.

3    Next I will address the Smith departure.  And then, finally,

4    I'll turn to the remaining arguments under 3553(a).

5          The Government has not met its burden in

6    demonstrating that Mr. Kahn qualifies for the four-point

7    enhancement as an organizer and leader.

8          The case law may be different outside the D.C.

9    Circuit; but, in this Circuit, Quigley is binding case law.

10          And while the Court should look to the factors

11    listed in the application notes to the guidelines, Quigley

12    elevates one of those factors and makes it a requirement.

13    That requirement is that the defendant managed or supervised

14    someone else in the conspiracy.

15          I note that Mr. Kahn's role, as described by the

16    Government, appears to be quite similar to the defendant in

17    Quigley.  The district judge in that case found that the

18    defendant was, in his words, an orchestrator of the

19    activity, the hub of the conspiracy; the person who put it

20    together and made it work.  And the D.C. Circuit said that's

21    not enough.

22          In order to qualify for the four-point

23    enhancement, the Government must show that Mr. Kahn

24    supervised or managed someone else or, in the Circuit's

25    words:  Have some sort of hierarchically superior

1    relationship with the persons who are purportedly his

2    subordinates; and they haven't done that.

3           They've called Agent Stempinski to the stand.  We

4    understand that the agent has extensive experience in these

5    types of cases; but he didn't interview a single witness in

6    this investigation.  And the evidence before the Court, to

7    prove this enhancement, is all based on unreliable hearsay.

8           We agree that the Court may consider hearsay under

9    circumstances such as these.  But the case law is clear that

10   the Court cannot consider unreliable hearsay.

11          One of the statements made by the agents -- by the

12   agent is that he read a report summarizing an interview

13   where witness Amay [sic] said that another witness, Hakim

14   said that Mr. Kahn is his boss; that's quadruple hearsay.

15          The agent wasn't the agent who interviewed witness

16   Amay.  The agent never spoke to Hakim.  And these interview

17   reports are not verbatim transcripts; they're summarized --

18   they're summaries of the interview that are written after

19   the fact.

20          Moreover, adding in the issues of -- in many

21   cases, we don't know what language the interview was

22   conducted in.  If it was conducted in English, we don't know

23   how good the witness's English was.

24          We understand that the Government takes pains to

25   hire qualified translators.  But when the difference hinges

1    on words such as whether someone worked "for" Mr. Kahn or

2    worked "with" Mr. Kahn, that is something that's easily lost

3    in translation.  That's arguably a minor error that makes a

4    huge difference in this case.

5         I would also note that witness Amay, who said that

6    Hakim said that Mr. Kahn is his boss, that witness made an

7    inconsistent statement in a sworn immigration proceeding

8    where that witness said that someone named Amir in

9    Afghanistan was a smuggler.  Amir paid Mr. Khan.  And, in

10   that sworn statement, the witness didn't at all mention

11   someone named Hakim.  That witness was interviewed twice as

12   part of this investigation and made statements about someone

13   named Hakim, but didn't make any statements about someone

14   named Amir.  So which is it?  I don't have an opportunity to

15   cross-examine that witness.

16        In this situation where there are multiple layers

17   of hearsay -- four in this case; there is inconsistent

18   statements; there is language issues.  And without that

19   witness here, we submit that this is unreliable hearsay that

20   should not form the basis of the Court's decision.

21        There is a second and related issue, which is that

22   the defense doesn't have access to these witnesses.  We

23   don't know who they are.  In discovery, the Government

24   provided over 3,000 pages.  Many of those pages are

25   interview reports, such as the one Agent Stempinski

1    testified to; but the names of all of the witnesses are

2    redacted.

3              MR. DIZINNO:  Your Honor, I would object to this

4    point.  I would ask to approach the bench.

5              THE COURT:  Come on up.

6              (Whereupon, a sealed bench conference was held.)



1     ████████████████████████

2     ████████████████████████████████

3     █████████████████████████████████████

4     █████████████████████████████████

5     ██████████████████████████████

6     (Whereupon, the sealed bench conference

7 concludes.)

8     MS. ITOH:  My point was, basically, the names of

9 the underlying witnesses are not available to the defense.

10 We have asked for them.  The Government, I understand, has

11 good reasons for not providing them; but, for whatever

12 reason, they haven't been provided.  The plea agreement

13 prevents us from compelling the Government to provide those

14 names.

15     So we're in a situation, for better or for worse,

16 the defense cannot do its independent investigation trying

17 to locate these witnesses, interview them ourselves, and

18 determine their credibility.

19     There is a D.C. Circuit case from 2008 Parhat v

20 Gates 532, F.3d 834.  I have copies that I can provide to

21 the Court and the Government.  But in that case the D.C.

22 Circuit vacated a lower court decision in the context of the

23 Guantanamo hearing because of similar concerns about

24 unreliability.

25     In that case, the lower court decision relied

1    primarily on government reports where the names of the

2    underlying witnesses were redacted for security reasons; and

3    I'm am not questioning their reasons for redacting the

4    names.  But the Court said in that situation the hearsay, if

5    the Court is going to consider it, must be presented in a

6    form or with sufficient, additional information that permits

7    the Tribunal and the Court to assess it through liability.

8          And I would submit that that standard has not been

9    met here because we don't know who those witnesses are.  We

10   cannot test their reliability.  They are not here in court

11   to testify or to be cross-examined.  And I can't even

12   independently investigate who these individuals are.

13         Keeping those issues in mind, looking at Agent

14   Stempinski's testimony, it establishes, at best -- I'll name

15   a couple of points.  That he testified that Mr. Kahn had one

16   or two people in his house working for him.  But there is no

17   evidence that those people were part of this conspiracy or

18   even knew that these travelers intended to enter the United

19   States without prior authorization.

20         THE COURT:  Let me ask you this question:  Are you

21   saying that the initials that the Government used are not

22   adequate for you to be able to determine from your client

23   who those individuals are?

24         MS. ITOH:  It's not just that.

25         I can't -- I don't know where they are.  I can't

1    even look them up in the ICE database and locate them at

2    whatever detention center or whatever country.  I mean,

3    there is -- separate and apart from speaking with my client,

4    if I want to do a thorough job in investigating these

5    witnesses, I would want to at least attempt to speak to them

6    myself.

7          THE COURT:  I guess what I'm asking is:  Are you

8    saying you don't know who these individuals are based upon

9    the fact that the Government has only provided their

10   initials?

11         MS. ITOH:  Correct.

12         The Government said that Mr. Kahn controlled the

13   movements of the travelers.  But, again, to meet the

14   requirement for the enhancement he has to supervise or

15   manage other people who are part of the conspiracy.  And to

16   the extent that they're saying that he's telling people

17   further down the chain:  Don't let so and so leave because

18   they haven't paid; I would say that his role is analogous to

19   that of a travel agent.

20         So if I hire a travel agent to book my airlines

21   and my hotels, but I only paid for part of the trip, if my

22   travel agent calls the airline and says:  Don't let Ms. Itoh

23   on the plane, she didn't pay for her plane ticket, that's

24   not the travel agent supervising or being hierarchically

25   superior to the person that works for the airline.  They're

1    horizontal business partners, and my travel agent is just

2    relaying information to somebody further down the chain;

3    that's his job.

4          If -- they talked about Mr. Kahn having contact

5    with the travelers as they go further on the journey --

6    again, if I get to my hotel in a foreign country and I don't

7    like the hotel, I might call my travel agent.  When the

8    travel agent calls someone at a different hotel and says:

9    Let Ms. Itoh stay; again, that's not him exercising

10   supervisory authority over the person that works at the

11   hotel.

12         The Government referred to certain individuals as

13   associates of Mr. Kahn.  I would note that that term -- that

14   doesn't convey supervisory authority.  One of the

15   individuals named as an associate is the individual in

16   Pakistan who -- Mr. Kahn expressed that he feared that

17   person.  He described that person as being a mastermind, as

18   being sort of an important and busy person, in an unrecorded

19   conversation where he had no reason to lie, no incentive to

20   lie, when he didn't know he was being recorded.

21         And what's left are statements, such as -- you

22   know, Mr. Kahn referred to someone as "his man."  But that

23   can mean that the person was Mr. Kahn's associate; it can

24   mean that it is someone that Mr. Kahn works with.  It

25   doesn't -- that's not enough to prove that this person

worked for Mr. Kahn.

The Government mentioned recruiters.  But someone who refers someone as a potential client, that's a one-off business transaction.  They refer the person; they collect the fee.  Again, that's not a supervisory relationship.

So what we're left with are these anecdotal statements which -- given the layers of hearsay, given the reliability concerns and the language issues, don't meet the standard to establish this enhancement.

I would also note that there is over 3,000 pages of discovery in this case.  There are hundreds of witness reports.  The Government said over 100 people identified Mr. Kahn as their agent.  They have submitted the testimony of three of these alleged witnesses, and they claim that there is more; but these are the three that they decided to put forth.  So I think we have to assume these are their three best ones.

I was notified the agent reviewed eight documents in preparation for his testimony.  And I have reviewed all of those documents, and all of the witness statements suffer from the same defects that I have pointed out here.

So it seems like, out of those 3,000 pages of discovery, they found ones that have nuggets or tidbits that say what they want the Court to believe.  But, really, I have reviewed a number of those statements.  There are many

1    people that say that they worked with Mr. Kahn; Mr. Kahn is

2    their agent.  But they don't say anything about him managing

3    or supervising anyone, not mentioning anything about him

4    being someone's boss.

5           Other factors that weigh against the enhancement,

6    there is no evidence that Mr. Kahn recruited accomplices.  I

7    mentioned earlier he fears certain other people in the

8    conspiracy; and he received a smaller portion of the

9    proceeds compared to the other coconspirators.  Mr. Kahn

10   received 3- to $400 per traveler; whereas his

11   coconspirators -- one person received $600 per traveler;

12   another received a thousand dollars per traveler; another

13   received 2700.  And I know the Government disagrees with

14   this point, but they haven't proffered any evidence to the

15   contrary.

16          So, for those reasons, we submit that the

17   Government has not met their burden to prove that the

18   four-point enhancement applies.

19          Next, we believe that the Court has discretion.

20          We request that the Court exercise discretion to

21   grant Mr. Kahn's motion for a six-month downward departure

22   under United States v Smith.

23          The point of the testimony you heard yesterday on

24   this issue appears to be that the Bureau of Prisons has good

25   and valid reasons for treating deportable aliens differently

1     than United States citizens guilty of the same conduct,

2     subject to the same guidelines.  And we're not questioning

3     whether or not they have a valid reason or not.  But the

4     fact remains that deportable aliens cannot go to a halfway

5     house to serve the tail end of their sentence.  They are

6     saying that a halfway house is not intended to be a benefit.

7          Well, asking any inmate, any one of my clients,

8     they will tell you that spending time in a halfway house is

9     much less severe and much preferable to spending that time

10    in prison.

11         THE COURT:  I would agree with you that the

12    ability to be placed in a halfway house does, in fact,

13    mitigate the sentence; and I think it is appropriate in an

14    appropriate case.  I'd take that into consideration when you

15    are talking about a deportable alien.

16         But what about the Government's representations

17    that they have checked and because he has travel documents

18    they believe that he can be put on a plane and out of here

19    in a week.

20         MS. ITOH:  I think that's a separate issue from

21    the Smith departure.  That's --

22         THE COURT:  But -- I don't mean to cut you off,

23    but -- you say it's a separate issue.  But if I don't factor

24    that in and if he's right and you are wrong, doesn't he then

25    gain a benefit that other folk don't because he -- once he's

1    deported, then he is not under any supervision, right?  I

2    mean, technically to be on supervised release --

3                MS. ITOH:  That's true.  But I think that the

4    Smith decision is very clear.  And they don't talk about

5    that additional delay after someone has served their

6    sentence and when they're in ICE custody; that's something

7    that I added as an additional reason for a variance.

8                But the Smith decision talks about the fact that

9    deportable aliens serve longer sentences because they spend

10   the whole time at the Bureau of Prisons' facility because

11   they are not eligible for halfway house placement.

12               I would add that some U.S. citizens are eligible

13   for home confinement for the tail end of their sentence.

14   And deportable aliens are subject to more severe sentences

15   because regardless of their criminal history -- and Mr. Kahn

16   is somebody who has no criminal history -- and regardless of

17   whether their conduct was violent or not -- I say this is

18   nonviolent conduct, they are not eligible to be placed in

19   the lowest security facility.

20               So, for those reasons, the Circuit said that the

21   Court has discretion to grant the six-month departure.  And

22   it doesn't matter whether there is good or bad reasons for

23   treating Mr. Kahn differently.  The Smith decision referred

24   to a Second Circuit decision about it means being placed in

25   solitary confinement and saying, in those cases, inmates

1    were placed in solitary for their own safety, and that's a

2    good reason to make someone's sentence more severe.  We're

3    not faulting the Bureau of Prisons for doing that; but it's

4    saying the Court can take that into consideration at this

5    stage.

6              THE COURT:  Do you know how many individuals who

7    are sentenced, in fact, do receive halfway house placement,

8    because all U.S. citizens don't; that may be --

9              MS. ITOH:  Correct.

10             THE COURT:  -- based upon the nature of the crime

11   or other factors.  But do you know what percentage of

12   offenders are, in fact, placed in halfway houses?

13             MS. ITOH:  I cannot -- I would be speculating.

14             I do know from -- anecdotally, from experience, I

15   do have clients who -- you know, they are placed in halfway

16   houses for the tail end of their sentence.

17             So if the four-point enhancement doesn't apply,

18   the guidelines are 24 to 30 months.  If the Court grants the

19   request for a Smith departure it's 18 to 24 months.

20             And so we're asking for a slight variance from

21   that guideline range.  Mr. Kahn has served the equivalent of

22   a 15-month sentence, and we ask that he be sentenced to time

23   served.

24             The Government has said a number of things about

25   Mr. Kahn's character.  They said that he didn't accept

1    responsibility.  And they reference the fact that, in their

2    belief, Mr. Kahn and the Government disagreed about certain

3    facts in conversations that Mr. Kahn has had with the

4    Government.  Your Honor has the reports of those

5    conversations.

6          We believe it's clear that in those conversations

7    Mr. Kahn accepted responsibility for his offense.  He

8    described his role in the offense in extensive detail.  He

9    provided extremely detailed information over three days.  So

10   we ask the Court to consider that.

11         As far as pleading guilty, it was a difficult

12   decision for Mr. Kahn to plead guilty.  This is his first

13   offense.  He is someone that's regarded very highly in his

14   community, among his family members; and he ultimately owned

15   up to what he did.  He pled guilty before this Court.  The

16   Court accepted his guilty plea.  The Government had no

17   objections to the Court accepting the guilty plea.  So,

18   ultimately, that's what he decided to do.  He pled guilty;

19   he accepted responsibility.

20         Mr. Kahn deeply regrets the instant offense.  And

21   I don't want to undercut that acceptance of responsibility;

22   but, as his counsel, I just want to make the point that this

23   was a dangerous route that the travelers -- that they

24   traveled on.  We have submitted a Washington Post article

25   where it said that 20,000 people from all different parts of

1    the world traveled along this route.  And I think it's

2    well-known among people who want to travel this route that

3    it is dangerous.

4            There is no evidence that Mr. Kahn tricked or

5    deceived the travelers.  He even said that he was willing to

6    travel that route himself.  I understand that these

7    travelers went through significant hardship to be able to

8    make the journey, but they wanted to go; that's how badly

9    they wanted to come to the United States.

10           Looking back, Mr. Kahn realizes that he failed to

11   appreciate the significant negative consequences of engaging

12   in this behavior, and he regrets that what he has done.  But

13   I just wanted to point that out.

14           Finally, the Government has characterized our

15   arguments about Mr. Kahn's history and characteristics as:

16   Oh, he's a good guy; he is a family man.  But we don't

17   believe those statements do justice to what Mr. Khan's

18   friends and family have said about him.

19           Mr. Kahn grew up under extremely dire

20   circumstances in one of the poorest regions of Pakistan.

21   They had eight family members crammed into a two-room

22   dwelling; that's where he grew up.  They lacked access to

23   basic necessities, to adequate health care.  And at the age

24   of 14, Mr. Kahn joined his older brothers in working to

25   provide for his family, to pay for his three sisters'

1    dowries so that they can marry into their own families.

2         When he was old enough, Mr. Kahn traveled

3    overseas, leaving behind everyone and everything that he

4    knew to travel overseas so that he can make enough money to

5    send home to support his family.  His parents described him

6    as the sole breadwinner, the person who is keeping our

7    family barely afloat.  And today Mr. Kahn's mother, father,

8    wife and 19-month old son depend on his income as well as

9    his emotional support in order to survive.

10        We made an argument in our sentencing memorandum,

11   and I just want to highlight that.  The case law is clear

12   that the Court may consider varying downward because of

13   these family circumstances not because they make Mr. Kahn

14   less culpable, but because the Court may also consider the

15   effect of his sentence on innocent family members who have

16   nothing to do with this offense.

17        I understand the Government has made certain

18   allegations about Mr. Kahn's character, that those --

19   whoever said these things, they are not before the Court.

20   To the extent they're relying on statements by his ex-wife,

21   I would note that there is some animosity and hostility

22   there.  Again, she is not here for me to cross-examine.

23        The Court has the letters from Mr. Kahn's family,

24   so we ask that those be taken into consideration.

25        At the end of the day, Mr. Kahn -- I mentioned

1    that he regrets the offense.  And he knows that his family

2    is suffering because of his conduct, that's why he's locked

3    up.  He feels horribly about that.  He's served the

4    equivalent of 15 months under especially punishing

5    conditions in the D.C. jail because, unlike other inmates,

6    he doesn't speak the language.  Nobody in the jail speaks

7    the language.  And his family cannot visit him; it's

8    prohibitively expensive to even call home.

9         While we disagree about how quickly ICE is going

10   to be able to deport him after he serves his sentence, I

11   think the Government conceded that they can't guarantee that

12   Mr. Kahn will be deported one week after he serves his

13   sentence, that there is factors outside the control of the

14   U.S. Government, such as whether Pakistan will take him

15   back; that's something they don't have control over.  He

16   might have travel documents, but I don't know that he has

17   authorization to reenter the country, so there might be a

18   delay.

19        And in the opinion of the immigration attorney

20   whose letter I submitted, she said, in her experience,

21   individuals in Mr. Kahn's situation have experienced delays,

22   especially when being deported to countries such as Pakistan

23   where there aren't that many people being deported on a

24   regular basis.

25        So, for all these reasons, we submit that a

1    sentence of time served is sufficient, but not greater than

2    necessary to achieve the purposes of sentencing.

3              THE COURT:   Thank you.

4              Does the Government want to respond to the

5    argument that your evidence regarding him being the

6    supervisor of other individuals is unreliable?

7              MR. SHECKELS:   Yes.   Good afternoon, Your Honor.

8              So there are several aspects of what Ms. Itoh just

9    argued that I think need to be addressed.

10             First of all, she really pins all of her stock in

11   Quigley.  And I think Your Honor -- respectfully, Quigley is

12   not the be-all-end-all in this Circuit when it comes to

13   3B1.1 role enhancements.  The Government has pointed out

14   other cases that, frankly, are far more factually analogous,

15   including another alien smuggling case in this Circuit,

16   United States v Yeh.

17             I think if you look at the activity that was --

18   the evidence relied upon to give a four-point enhancement in

19   that case, it's far more factually similar than a local

20   D.C.-based FHA loan fraud scheme that existed in Quigley.

21             Mr. Kahn, the evidence that we provided to

22   you and, frankly, information that Mr. Kahn has agreed to as

23   part of this factual proffer in this case, that defense

24   attorney also submitted to Your Honor in one of the filings

25   various information, statements that Mr. Kahn made -- Your

1    Honor should review those carefully.  Because to the extent

2    that Ms. Itoh would have Your Honor throw the baby out with

3    the bath water when it comes to the various witness

4    statements that we have provided, we would submit that

5    Mr. Kahn has admitted to probably 90 percent of his activity

6    in this case.  It seems the only thing that he's not willing

7    to admit to or that he hasn't provided statements to the

8    Government about are things like his role in the

9    organization that, frankly, are going to result in him

10   getting a more significant sentence.

11          When you look at the fact that he admitted to

12   making payments to various individuals all along the route,

13   people that he was responsible for smuggling for -- and the

14   evidence is significant; not just the witness statements,

15   but for other testimony that was provided by the agent

16   yesterday; is that Mr. Kahn was the man that moved people --

17   and the most significant mover of people from Pakistan,

18   South Asia, from Brazil to the United States.  And he relied

19   on a network of people to do that, and he paid them as they

20   went.

21          So rather than him being a travel agent, it seems

22   to me Mr. Kahn's role is more analogous to the CEO of a

23   multinational corporation where he's paying people that are

24   assisting him throughout the process.  Overseas in Pakistan

25   he has made statements.  And the agent testified to those

1    things yesterday, about the fact that he had recruiters that

2    would hook him up with clients before they ever even got to

3    Brazil.

4          So he had a pipeline, he had folks working for

5    him, even as far back as Pakistan, to facilitate his ability

6    to make money out of this business; and he made a

7    significant amount of money.

8          Now, Ms. Itoh mentions that he only made 3 to $500

9    off of these smuggled aliens; that is Mr. Kahn's position.

10   That's the statement that he made in the case.  But,

11   frankly, it is totally contradictory to the other evidence

12   in the case.  If you just look at the testimony that was

13   provided by Agent Stempinski -- and, again, it's a small

14   sample size, it's only three witnesses.  But, obviously, in

15   a case with hundreds of witnesses, the Government's

16   intention was not to provide a bunch of cumulative evidence

17   about dollar amounts that were paid; but those witnesses

18   that were discussed yesterday talked about $10,000, $15,000.

19   And to the extent that Mr. Kahn himself has admitted that he

20   received most of the money and then would divvy it out to

21   different smugglers that were assisting him with his aliens

22   travel -- the fact that if he received $15,000 all he was

23   making for doing that was 300 to $400, frankly, is

24   laughable.  You should not credit Mr. Kahn's statement in

25   that regard.

1          And, again, I would point out that to the extent

2     that he's admitted a lot of the conduct in this case, Agent

3     Stempinski testified about the fact that, in the statements

4     that Mr. Kahn made to law enforcement, a general pattern, a

5     theme, frankly, part of the reason why we're here under the

6     circumstances -- we are under the plea -- is that

7     information he provided about his own activity was simply

8     not credible.

9          So -- but to the extent that we understand Quigley

10    and this idea of hierarchical superiority is a significant

11    consideration for Your Honor -- not the only consideration,

12    but a significant consideration.  We would submit that you

13    have evidence you can rely on about that.  We have three

14    different witnesses that were testified about that didn't

15    know each other during different time frames; in some

16    instances, they came from different countries.  They

17    provided general information about individuals identifying

18    Kahn as their boss.  Kahn himself saying that this person

19    worked for me, and information of that sort.  That's both --

20    in Brasilia, where Kahn was clearly operating his own little

21    cottage industry of cycling folks in.

22         Two different witnesses again talked about how

23    there were about 50 people at this house that Kahn was

24    operating.  The operation of a stash house is a thing

25    that -- it's the type of thing that other courts have looked

1    to in trying to figure out whether a role enhancement should

2    apply.

3            Again, handling money, making money transfers,

4    being sort of the straw that stirs the drink financially,

5    another factor; so we have evidence of that as well.

6            Now, there has been much made about the Government

7    not providing the names of individuals in this case.  Your

8    Honor, the Government would submit we have already dealt

9    with this in some ways at the bench, but that there were

10   very significant reasons in this case to not provide some of

11   that information.

12           There are significant witness security concerns.

13   Mr. Kahn himself and his counsel have raised those concerns

14   on his behalf; and what is good for the goose is good for

15   the gander.  The Government had good reasons to protect

16   these individuals' information that have come forward and

17   provided information about significant international

18   criminal activity.  Other coconspirators that are, frankly,

19   across the globe.

20           You heard testimony yesterday from Agent

21   Stempinski about the fact that a number of those individuals

22   are not under arrest, they're still operating freely.

23           Witnesses in this case, Your Honor, including

24   individuals that were referenced yesterday, had family still

25   back in Pakistan; so that is of significant concern of the

1    Government.  And there is case law support within D.C., in

2    the context of witnesses and informants that provide

3    information about making efforts to protect those

4    individuals' identities.

5         I would also point out, Your Honor, that much of

6    what I think Ms. Itoh is getting to is probably more

7    applicable in the context of a trial setting rather than a

8    sentencing.  Keep in mind, when Your Honor is trying to

9    evaluate things like what type of role enhancement is

10   appropriate, you have the right to be provided with relevant

11   conduct information so you can make an assessment of what

12   is an -- craft an appropriate sentence in a case like this.

13        And hearsay and the other rules of evidence,

14   frankly, don't apply in the context of a sentencing hearing.

15   But even having said that, we provided a significant amount

16   of information to the defense about these individuals that

17   Mr. Kahn moved.  Mr. Kahn, in fact, presumably knows the

18   individuals that he's assisted.  He's admitted in a

19   statement of facts in this case to providing this service

20   for 25 to 99 people.

21        You know, for all of those reasons -- to the

22   extent the touchstone for Your Honor's assessment of whether

23   you can credit the testimony that was provided yesterday

24   about these individual statements -- the touchstone is that

25   there is sufficient indicia of reliability to support the

1    information's probable accuracy.  And we think from the

2    three witness statements; frankly, the other information

3    that Agent Stempinski provided; as well as some of the

4    information that corroborates those individuals and

5    dovetails with the investigative results that Mr. Kahn

6    himself has provided -- for all of those reasons, you have

7    enough to hang your hat on when it comes to trying to

8    determine what Mr. Kahn's role was from the information that

9    the Government has provided, Your Honor.

10              THE COURT:  Thank you.

11              MS. ITOH:  May I be heard, Your Honor?

12              THE COURT:  Briefly, yes.

13              MS. ITOH:  With regard to the argument about

14   hearsay, I am not saying that the Court cannot consider

15   hearsay.  I understand it's admissible in a sentencing

16   hearing.  But I am saying that the case law is clear in

17   other contexts where the Court may consider hearsay, such as

18   in the Parhat case.  There are cases in the parole context

19   where the Court may consider hearsay; but the courts draw

20   the line at unreliable hearsay.

21              Here we have the problem of not knowing who the

22   witnesses are; multiple layers of hearsay; prior

23   inconsistent statements by the same witnesses that they're

24   relying on here; and, then, witnesses that admit that

25   they're not good at English, but the interview is conducted

1    in English or it's conducted through a translator -- or we

2    don't know what language it is in.

3         Given those concerns, we submit that it's

4    unreliable, and the Court should not rely on it.  The

5    Government doesn't seem to like the Quigley case; but until

6    it's overruled, Quigley is the law in this Circuit.  And

7    Quigley stands for the fact -- and it quotes from United

8    States v Graham, which is another D.C. Circuit case; that

9    one is from 1998.  It says:  As we have recognized, all

10   persons receiving an enhancement under 3B1.1 must exercise

11   some control over others.  And they attempt to distinguish

12   it based on the fact that it's a mortgage fraud case.

13        They cite this other Yeh case, which is the one

14   alien smuggling case they found in the D.C. Circuit.  But

15   the Yeh case is factually very different from this case.

16        Yeh was the boat captain of a smuggling ship.  And

17   when law enforcement tried to climb aboard the ship, he

18   refused; and he held himself out as being in charge and

19   having authority over the other conspirators on the ship.

20   It's a factually inapposite situation.

21        In Quigley -- yes, it's a mortgage fraud case;

22   it's a different type of conspiracy.  But, in that case, the

23   Government said that Quigley controlled the property buyers

24   because she recruited them and told them how to trick the

25   FHA.  The Government claim is she controlled appraisers, and

1   she told them the appraisal value to try and solicit them.

2   So she's playing a similar role to what they are saying

3   Mr. Kahn did, being the person that communicates with

4   everyone in the conspiracy and relays information and,

5   quote-unquote, organizes it and makes it happen.  And the

6   Circuit said that's not enough because she didn't supervise

7   anybody.

8           Finally, with regard to the payment issue, I

9   understand that Agent Stempinski testified that what

10  Mr. Kahn said about how much he was paid was not accurate.

11  But Agent Stempinski didn't say how much Mr. Kahn was paid.

12  He said it was not consistent with the evidence in the case,

13  but they didn't say how they knew that or what evidence it

14  was inconsistent with or what evidence they're relying on;

15  so we'd ask the Court to disregard that.

16          THE COURT:  If I were to adopt fully the

17  defendant's position as is acknowledged, that would only

18  drop the sentence to 18 to 24 months.  He has done,

19  according to what I was told, about 15 months.

20          I think, considering the fact that this is a

21  contentious issue on the question of whether the four-point

22  enhancement or a three-point enhancement is appropriate --

23  the issue regarding the Smith departure is a different and

24  perhaps, I think, a simpler issue.  I think it would be

25  prudent for me to write something rather than trying to

1    articulate my reasoning from the bench.  It will be,

2    obviously, helpful for me to have the transcript of

3    yesterday's hearing.  I did take notes of that, but

4    obviously they aren't verbatim.  I think it would be helpful

5    for me to have that transcript and to review again all of

6    the other evidence, along with the case law, and to issue a

7    written opinion as to what the ruling would be because I

8    would not agree that a time-served sentence would be

9    appropriate.

10            This is a very serious crime.

11            One only need look at the media coverage in the

12    last several days to know that having individuals come

13    through the Southwest border is a very dangerous

14    proposition, and people die as a result of trying to come

15    into the country through that route.

16            So even if I were to totally accept -- which I am

17    not saying I will do -- the defense position, we'd still be

18    talking about an 18-month sentence.  So that would be a

19    requirement, that he serve at least three more months before

20    he would be released.

21            I think the prudent thing is to get a transcript

22    of yesterday's hearing to review all of the evidence that

23    otherwise is in the record and to issue a written opinion,

24    which I would hope to be able to do within 30 days.

25            So if I did accept the defendant's position, he is

1    not going to do anymore time waiting for a ruling than

2    otherwise would be the case since I would conclude, as I

3    said, any time-served sentence would not be an appropriate

4    sentence considering the seriousness of the conduct that the

5    defendant committed.

6              So I will take the matter under advisement.  Once

7    I have written the opinion, then I will issue a date to come

8    back and make my ruling from the bench.  I do think that's

9    the more prudent thing to do.

10             I will need the parties to get a copy of the

11   transcript which you are going to need at some point.  And

12   try to get it on an expedited basis so I can try to get a

13   ruling in within the next 30 days.  Thank you.

14             (The proceeding was adjourned, 4:21 p.m.)

15                          *  *  *  *  *

16                          **CERTIFICATE**

17

18             I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby

19   certify that the foregoing constitutes a true and accurate

20   transcript of my stenographic notes, and is a full, true,

21   and complete transcript of the proceedings to the best of my

22   ability.

23

24             Dated this 11th day of August, 2017.

25             /s/ Elizabeth Saint-Loth, RPR, FCRR
               Official Court Reporter